**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

———————————————— )
MEDIA GENERAL, INC.,          )
                              )
        Plaintiff,            )
                              )
        v.                    )     Civil Action No. 98-1690 (RWR)
                              )
DONALD R. TOMLIN, JR.,        )
  et al.,                     )
                              )
        Defendants.           )
———————————————— )

<u>MEMORANDUM OPINION</u>

Plaintiff Media General, Inc. ("Media General") purchased Park Communications, Inc. ("Park") and its liabilities for $710 million, allegedly without knowing certain details of a threatened civil action by Rick Prusator, a former Park employee. Media General, asserting a violation of Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. § 240.10b-5, promulgated under 15 U.S.C. § 78j(b), common law fraud and civil conspiracy, has sued defendants Donald R. Tomlin and Gary B. Knapp, Park's sole shareholders, Wright M. Thomas, Park's then-President, and Stephen Burr and his law firm, Eckert Seamans Cherin & Mellott, LLC ("Eckert"), Park's outside counsel for the transaction. Defendants collectively filed multiple motions for summary judgment, which plaintiff opposed.[1] Because the $10

_____

[1] Defendants presented multiple arguments in their collective motions for summary judgment and were granted summary judgment on the basis of just one argument. On appeal, the order was reversed and the case remanded. <u>Media General v. Tomlin</u>, 387

-2-

million that Media General seeks in fraud damages is barred as a matter of law for both the securities and common law fraud claims, it will be disallowed.  In addition, because Media General has not shown that defendants "omit[ted] to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading," 17 C.F.R. § 240.10b-5, and because defendants have shown that no jury could reasonably conclude that plaintiffs' reliance on defendants' statements regarding the risk posed by a potential lawsuit against Park was reasonable, defendants will be granted summary judgment.

<u>BACKGROUND</u>

In the early summer of 1996, Park's sales agent approached Media General about a possible sale of Park.  In anticipation of executing a merger agreement, Media General engaged in certain due diligence efforts through its outside counsel Dow Lohnes & Albertson ("Dow"), spearheaded by Leonard Baxt, a senior partner in Dow's corporate department.  (Defs. Eckert & Burr's Mot. for Summ. J., Decl. of Emily Nack ("Nack Decl.") Vol. II, Ex. 35, Dep. of Leonard Baxt, Dec. 9, 2002 ("Baxt Dep.") at 69-70.) Those efforts included review by a Dow attorney of audit response letters describing pending and potential litigation then known.

---

F.3d 865 (D.C. Cir. 2004).  Here, other arguments made in the defendants' collective motions for summary judgment are considered.

-3-

(Nack Decl. Vol. I, Ex. 11, Memo. from Timothy Power to Stephen Dickinson and George Mahoney, July 18, 1996); Nack Decl. Vol. II, Ex. 38, Dep. of George Mahoney, Aug. 1, 2002 ("Mahoney Dep.") at 218-19.)  On July 19, 1996, the parties executed the merger agreement providing for the sale of Park to Media General for $710 million.

Media General's general counsel, George Mahoney, was in charge of the legal aspects of the Park acquisition.  (Mahoney Dep. at 257.)  As he had in prior recent acquisitions, Mahoney oversaw the legal due diligence efforts by delegating them to Dow.  (Mahoney Dep. at 14-16, 212.)  John Byrnes, a senior partner at Dow in the firm's corporate department, took charge of the post-merger agreement legal due diligence efforts under Mahoney's direction.  (Nack Decl. Vol. II, Ex. 36, Dep. of John Byrnes, Sept. 9, 2002 ("Byrnes Dep.") at 10.)

In September 1996, in preparation for consummating the merger, Park asked Coopers & Lybrand, LLP ("Coopers") to assist with an audited financial statement of Park, a process that included requesting updated audit response letters.  By late September, Media General knew of Coopers' audit.  As is customary for an acquiring company in a major acquisition, Media General asked for and was granted direct access to the financial information and work papers Coopers had in order to prepare Park's audited financial statement.  All defendants knew that

-4-

Media General had access to Coopers' working papers and the
papers Park provided to Coopers for the audit.  (Nack Decl.
Vol. II, Ex. 37, Dep. of Stephen Dickinson, May 9, 2002, at 30;
Nack Decl. Vol. II, Ex. 39, Dep. of Phillip Gregory, Nov. 20,
2002, at 188-90.)

On September 6, 1996, Prusator, a former Park employee, made
a letter demand of $139,000 that he alleged was severance pay due
him, and threatened a lawsuit.  Two weeks later, Prusator sent a
letter to Marshall Morton, a senior officer at Media General,
mentioning the unresolved issue of unpaid severance that he had
turned over to an attorney for recovery.  (Opp'n Ex. 10.)  Morton
asked Stephen Dickinson, Media General's corporate controller, to
find out more about the Prusator case, and Dickinson, in turn,
questioned Park's president, Thomas.  Thomas, by telephone as
well as by letter dated October 14, 1996, provided Media General
with the severance agreements at the heart of the dispute and
explained Park's position on the matter.  (Opp'n Ex. 9.)  Through
Eckert, Park sent Prusator's attorney a letter dated October 23,
1996, warning that further communications from Prusator with
Media General would be construed as tortious interference with
contract.  (Opp'n Ex. 13.)  Park, by letter dated October 31,
1996, asked its attorneys at Eckert to write an audit response
letter, and specifically to provide Coopers with information

about any claims seeking more than $100,000.  (Nack Decl. Vol. I, Ex. 15.)

By letter dated November 9, 1996 enclosing a draft complaint, Prusator's attorney informed one of Park's attorneys at Eckert that Prusator was expanding his demands to include claims for fraud, misrepresentation, breach of fiduciary duty, intentional interference with breach of prospective contract rights, civil RICO violations, securities law violations, wrongful termination of employment and breach of good faith and fair dealing.  Prusator estimated the value of these new claims at between $3 and $6 million.  (Nack Decl. Vol. I, Ex. 7.)  By letter dated November 12, 1996, Stephen Burr, a partner at Eckert and outside counsel to Park, Tomlin and Knapp for this transaction, sent copies of the draft Prusator complaint and accompanying letter to Thomas, Tomlin and Knapp, and stated his assessment that the expanded claims appeared to be based on very frivolous grounds.  (Id.)  Burr also informed Coopers about Prusator's expanded demands in his audit response letter dated December 4, 1996.  (Nack Decl. Vol. I, Ex. 16.)  The draft audited financial statement included a footnote identifying contingencies and explicitly describing the details of Prusator's expanded claim.  (Nack Decl. Vol. I, Ex. 17 at 10.)

Although Baxt and Burr had several telephone contacts during the fall of 1996, it was not until January 2, 1997 that they

discussed the Prusator matter.  (Baxt Dep. at 140-41.)  The
subject came up in the context of discussions about several
issues for which Media General was seeking dollar adjustments to
the closing price, and discussion of the Prusator suit was
limited to the parties' respective positions on the closing
adjustment it warranted.  (Baxt Dep. at 136-37; Defs. Eckert &
Burr's Mot. for Summ. J., Suppl. to Nack Decl. ("Nack Suppl.")
Ex. 41-A, Dep. of Stephen Burr ("Burr Dep.") at 206.)  At that
point, Park had offered $50,000 in an attempt to settle the
matter before closing, but Prusator had rejected the offer.  Park
maintained its position that the claim could be settled for
$50,000, but Media General, knowing it would assume liability at
closing, wanted an adjustment for the whole $139,000 relating to
severance pay.  (Burr Dep. at 191, 206-08.)

The lead lawyers involved in this transaction, Mahoney,
Baxt, Byrnes, and Burr, were each experienced in corporate
mergers and familiar with audit response letters.  They each knew
that audit response letters were often reviewed by the purchasing
company in connection major acquisitions.  (Mahoney Dep. at 212-
23; Baxt Dep. at 150-152; Byrnes Dep. at 170-71.)  Prior to
executing the merger agreement in July, Mahoney and Baxt had
received a memorandum noting that audit response letters had been
reviewed by a Dow attorney as part of the due diligence effort.
However, in the period between executing the merger agreement and

executing the merger, neither Media General nor its outside counsel reviewed Park's draft audited financial statement or the audit response letter detailing Prusator's expanded claims. (Mahoney Dep. at 212-27; Byrnes Dep. at 173.)  Dickinson did not press for a copy of the audit report before the closing, and asked only that he receive a copy when the audit was completed. (Nack Suppl., Ex. 41-D, Dickinson Dep. ("Dickinson Dep.") at 296.)  Mahoney failed to tell Byrnes about the ongoing audit by Coopers.  (Nack Suppl., Ex. 41-F, Mahoney Dep. at 130.) Byrnes, who led the legal due diligence effort, did not himself do any due diligence on the Prusator matter prior to the pre-closing meetings, and does not recall whether anyone working under his direction or control did any due diligence on the Prusator claim.  (Byrnes Dep. at 46.)

Closing was scheduled for January 7, 2007.  At the pre-closing discussions on January 6 and 7, Mahoney, Baxt, and Byrnes divided up the negotiating duties on Media General's side, and Dickinson was with them at the table.  (Dickinson Dep. at 109.) Burr represented Park and its owners, with Thomas at his side for the purpose of providing information to the buyers.  (Nack Suppl., Ex. 41-G, Dep. of Wright M. Thomas, May 14, 2002 ("Thomas Dep.") at 181, 188.)[2]  About ten or twelve items on a closing

_____

[2]  Other people were present as well.  (Burr Dep. at 187-88; Thomas Dep. at 181, 196.)  However, no statements pertinent to this lawsuit were attributed to any of these other people, and no

-8-

checklist involving price adjustments well in excess of $10
million in the aggregate were serially discussed, first between
the parties' representatives and then between the principals and
their representatives in private. (Nack Suppl., Ex. 41-B, Baxt
Dep. ("Baxt Dep. at Nack Suppl.") at 89-94; Byrnes Dep. at 47-
48.) The threatened litigation from Prusator was just one of the
several items under discussion. (Baxt Dep. at Nack Suppl. at 91-
93.)

Byrnes, Baxt, Mahoney and Dickinson have slightly differing
recollections of the discussion about the Prusator matter at the
pre-closing. Byrnes, who took the lead on the Prusator matter,
made no contemporaneous record memorializing the discussion (Nack
Suppl., Ex. 41-C, Byrnes Dep. at 205), but recalls saying "[t]ell
us about the Prusator matter." (Byrnes Dep. at 50.) He also
recalls that in response Thomas explained that there were two
severance agreements and that Park viewed the later agreement as
superceding the earlier and that Prusator disagreed, that the
figure $147,000 was bandied about, that Park had offered $50,000
to settle the matter, but that Prusator wanted the entire
$139,000, and that Byrnes asked follow-up questions about the two
agreements and commented that perhaps the two agreements were not
perfectly drafted. (Id. at 50-51.) Byrnes recalls that Burr did
not say anything at this time. (Id. at 51.)

_____

testimony from them was included in the record.

-9-

Baxt took notes during some of the pre-closing meetings, and had reviewed them prior to his deposition.  The notes, however, were not capable of identifying who said what or distinguishing what was actually said from what was understood.  (Baxt Dep. at 99; Baxt Dep. at Nack Suppl. at 101-07.)  Without any specific recollection of the words he or anyone else spoke (Baxt Dep. at Nack Suppl. at 95, 98), Baxt generally recalls that both he and Byrnes asked for an update on the Prusator claims, that Thomas began to explain the dispute as to the severance agreement, and that Burr said there was nothing new to report in addition to what had already been disclosed to Media General.  (<u>Id.</u> at 95-98.)  He does not recall any discussion of the merits of the Prusator claim.  (<u>Id.</u> at 98.)

Mahoney, like Baxt, does not recall specific words or exchanges, and cannot distinguish between what Thomas and Burr contributed, but rather recalls what Media General's representatives understood as a result of the exchanges.  (Mahoney Dep. at 66-69.)  He recalls that Byrnes asked Burr and Thomas to "[t]ell us all about the Prusator matter," and that both Burr and Thomas responded.  (<u>Id.</u> at 66.)  He recalls that the background of the dispute was reviewed, that a claim for a maximum of $139,000 was noted, and that neither Burr nor Thomas had much regard for the merits of the claim.  (<u>Id.</u> at 68.)  Mahoney has a specific recollection that "during the course of

-10-

the day," Burr used the term "maximum" in connection with the
figure $139,000 a "number of times."  (<u>Id.</u>)

Like Baxt and Mahoney, Dickinson testified that he does not
recall specific words, does not recall the dialogue, and does not
recall anything specific that Burr said during this discussion,
but only the general tenor of the opening questions, which he
characterized as designed to prod and poke.  (Dickinson Dep.
at 113, 116, 119.)  Dickinson recalls that Byrnes questioned Burr
and Thomas using fairly broad, general questions, asking that
Thomas "tell me about the Prusator matter," asking follow up
questions, and eliciting liability assessments.  (<u>Id.</u> at 112-13,
119.)  He has a general recollection that Burr stated that the
matter was worth no more than $139,000 and could be settled for
less than that.  (<u>Id.</u> at 136.)  At the time, Dickinson did not
have the impression that Thomas' answers were either incomplete
or false.  (<u>Id.</u> at 116-17, 122.)  Only in hindsight did Dickinson
develop the view that he had been misled.  (<u>Id.</u>)

Burr, representing the sellers in the transaction, testified
that he approached the pre-closing discussions in the belief that
Media General was aware of the expanded Prusator claims because
they had been disclosed in detail in the audit response letter of
December 4, 1996.  He had discerned nothing from Media General
indicating it was unaware, and he had earlier "suggest[ed] to
[Tomlin and Thomas] that if [the expanded set of claims] hadn't

already been disclosed, it should be disclosed before I sent the
audit response letter so that the audit response letter would not
come as a surprise."  (Burr Dep. at 186.)

> A:    I want to make sure I am precise about this.  I
>       believe I was clear in my own mind, walking into
>       that meeting, that Media General and its counsel
>       knew all about [the] expanded claims.  I did not
>       hear anything either in a form of a question to
>       Mr. Thomas, or in anything Mr. Thomas said, or in
>       any question or comment that anyone else made,
>       that suggested to me in any way that they didn't
>       know about it.  I do not recall that anything was
>       said during the meeting in which it was made clear
>       that they did [not] know about it.  The subject,
>       literally, to the best of my recollection, of the
>       expanded claims, did not come up and I did not
>       hear a question or a comment that suggested to me
>       that Media General did not know about it.

(Id. at 218.)  Burr also was under the impression that his
clients believed that Media General was aware of the expanded
claims.  (Id. at 191-92, 195-96.)  Burr recalls that he was not
asked by anyone representing Media General to describe the
Prusator matter (id. at 216-17; Nack Decl. Vol. II, Ex. 33, Burr
Dep. ("Burr Dep. at Nack Decl.") at 222-23, 237), and that Thomas
was not asked to do so, either.  (Burr Dep. at 217.)
Furthermore, he is sure that if Thomas had started to give an
incomplete or misleading answer to such a question, he would have
corrected him and provided details.  (Id.; Burr Dep. at Nack
Decl. at 226-27).  Burr recalls that Thomas never said that
Prusator only made a claim for $139,000.  (Burr Dep. at Nack
Decl. at 222-23, 225-27.)  Burr testified that "I know that we

-12-

[he and Thomas] did not say anything during the course of that meeting which would have suggested that we believed that Mr. Prusator had no claims other than the claim for $139,000." (<u>Id.</u> at 223.)  When Burr was asked if in his own discussions with Media General, he had discussed only the claim for $139,000 from Prusator, he responded:

> A:  Actually, that wasn't the way I viewed it, rightly
>     or wrongly.  I viewed it that I had told Media
>     General all about the $3 to $6 million claim.
>     That was certainly my state of mind during that
>     meeting.
>
> Q:  Because you had prepared an audit response letter?
>
> A:  That's right.

(<u>Id.</u> at 223.)

Thomas, Park's out-going president, was present at the meeting to answer factual questions, but did not represent the sellers in the closing, and had no communications with the sellers during the pre-closing and closing negotiations.  (Thomas Dep. at 187-88, 192-93, 198.)  Thomas recalls that one of the Dow attorneys, whose name he could not remember, asked Thomas to tell him the about the Prusator dispute, and Thomas gave a lengthy response providing the detail of the dispute over the severance pay, and that Burr did not say anything during this exchange. (Thomas Dep. at 190-92.)  Thomas acknowledges that during these discussions he did not mention the November 9, 1996 letter from Prusator's attorney, Prusator's expanded claims, the draft

-13-

complaint or the $3 million settlement demand.  Rather, Thomas "understood the question to be 'tell me about the Prusator dispute' which I proceeded to do."  (Id. at 192.)

## DISCUSSION

On a motion for summary judgment, "[t]he inquiry performed is the threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  Summary judgment may be granted only where the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Burke v. Gould, 286 F.3d 513, 517 (D.C. Cir. 2002).  A material fact is one that is capable of affecting the outcome of the litigation.  Liberty Lobby, 477 U.S. at 248.  A genuine issue is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," id., as opposed to evidence that "is so one-sided that one party must prevail as a matter of law."  Id. at 251-52.  In considering a motion for summary judgment, all "justifiable inferences" from the evidence are to be drawn in favor of the nonmovant.  Id. at 255.  The

-14-

nonmoving party, however, must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the nonmovant must "come forward with 'specific facts showing that there is a genuine issue for trial.'" Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original). If the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of the claim, any factual disputes with respect to other elements of the claim become immaterial and cannot defeat a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In the end, "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

The SEC's Rule 10b-5, promulgated to implement 15 U.S.C. § 78j(b), prohibits

> the use of any means or instrumentality of interstate commerce, or of the mails . . ., (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b-5. To prevail on a Rule 10b-5 claim, a plaintiff must prove "(1) *a material misrepresentation (or omission)*, . . .; (2) *scienter*, . . .; (3) *a connection with the*

-15-

*purchase or sale of a security*, . . .; (4) *reliance*, . . .;
(5) *economic loss, . . .;* and (6) '*loss causation*,' <u>i.e.</u>, a
causal connection between the material misrepresentation and the
loss . . . ." <u>Dura Pharms., Inc. v. Broudo</u>, 544 U.S. 336, 341-42
(2005) (citations omitted; emphasis in original).  Where the
plaintiff is sophisticated and experienced in business, the
reliance must be reasonable, and the plaintiff must have
exercised due diligence in connection with the transaction in
question.  <u>Hammerman v. Peacock</u>, 607 F. Supp. 911, 916 (D.D.C.
1985) (citations omitted); <u>Straub v. Vaisman & Co.</u>, 540 F.2d 591,
597-98 (3d Cir. 1976) (stating that the sophistication of the
plaintiff is one factor in determining whether plaintiff has met
his obligation of due care, which is a flexible standard
dependent on the circumstances).

Proving common law fraud requires a plaintiff to show that
defendants, with the intent to induce reliance by plaintiff,
knowingly falsely represented or wilfully omitted a material fact
on which plaintiff relied to its detriment, resulting in provable
damages.  <u>Schiff v. Am. Ass'n of Retired Persons</u>, 697 A.2d 1193,
1198 (D.C. 1997) (citing <u>Howard v. Riggs Nat'l Bank</u>, 432 A.2d
701, 706 (D.C. 1981)); <u>Railan v. Katyal</u>, 766 A.2d 998, 1009 (D.C.
2001).  Where, as here, the transaction involved a commercial
contract negotiated at arm's length, a plaintiff's reliance must

-16-

be reasonable.  Hercules & Co. v. Shama Rest. Corp., 613 A.2d
916, 923 (D.C. 1992).

To prove a common law civil conspiracy, a plaintiff must
show an agreement between two or more persons to participate in
an unlawful act, or in a lawful act in an unlawful manner, and an
injury caused by an unlawful overt act performed by one of the
parties to the agreement pursuant to, and in furtherance of, the
common scheme.  Executive Sandwich Shoppe, Inc. v. Carr Realty
Corp., 749 A.2d 724, 738 (D.C. 2000) (quoting Griva v. Davison,
637 A.2d 830, 848 (D.C. 1994)).  There is no recognized
independent tort action for civil conspiracy in the District of
Columbia.  Id. (quoting Waldon v. Covington, 415 A.2d 1070, 1074
n.14 (D.C. 1980)).  Rather, civil conspiracy is a means to
establish vicarious liability for the underlying tort.  Id.
(quoting Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)
(quotation marks and alteration omitted)).  Here, then, if Media
General cannot prove either securities fraud or common law fraud,
it cannot prove a civil conspiracy.

I.   FRAUD DAMAGES

Media General argues that in addition to the cost of
litigating and settling the Prusator claim, its fraud damages
include $10 million, or the difference in the price Media General
would have paid if it had known of the expanded Prusator claim.
Media General's $10 million is not recoverable under either

-17-

federal securities fraud law or the District of Columbia's common law fraud.

To recover damages for securities fraud, a plaintiff must show both economic loss and loss causation.  Dura Pharms., 544 U.S. at 342.  Loss causation requires proof that the alleged misrepresentations or omissions "caused the loss for which the plaintiff seeks to recover."  Id. at 345-46.  The remedy provided by the securities fraud statute does not embrace an "artificially inflated purchase price," which "is not itself a relevant economic loss."  Id. at 347.  The $10 million Media General seeks is based on nothing more than a bald assertion that the purchase price would have been lower but for defendants' alleged omissions.  In other words, Media General's position is that the purchase price was artificially inflated due to defendants' alleged material omissions.  Such damages are barred expressly by Dura Pharmaceuticals.

To recover damages in the District of Columbia for common law fraud, a plaintiff "must show that 'provable damages' resulted from the fraud."  Kitt v. Capital Concerts, Inc., 742 A.2d 856, 861 (D.C. 1999) (quoting Dresser v. Sunderland Apts. Tenants Ass'n, 465 A.2d 835, 839 (D.C. 1983)); see also Railan, 766 A.2d at 1009 (listing elements of fraud, including provable damages).  Media General's purported $10 million in damages is highly speculative and Media General has offered no basis in fact

for its quantification of the supposed price differential.
Because the amount is not reasonably subject to proof, it cannot
be considered as damages under D.C.'s common law of fraud.

II.  OMISSIONS IN LIGHT OF THE CIRCUMSTANCES

To show that defendants violated Rule 10b-5, Media General
must show both that defendants made an omission, and that the
omission was misleading "in light of the circumstances under
which [it was] made."  17 C.F.R. § 240.10b-5.  A court considers
allegedly fraudulent omissions in context to determine whether a
reasonable investor would have been misled.  The touchstone of
this inquiry is not isolated statements, but "all the defendants'
statements, taken together and in context[.]"  Rombach v. Chang,
355 F.3d 164, 173 n.7 (2d Cir. 2004) (quoting I. Meyer Pincus &
Assocs. v. Oppenheimer & Co., 936 F.2d 759, 761 (2d Cir. 1991)).

The credibility of the plaintiff's witnesses and the correct
weight to accord the accuracy of the memories that are more than
five years old are matters reserved for the fact-finders.  On
summary judgment, the benefit of any reasonable inference accrues
by law to Media General.  Even with that benefit, Media General
has established at the most only the following three probative
facts:  that in response to Byrnes asking Thomas to tell him
about the Prusator dispute, Thomas reviewed with a fair amount of
detail the features of the severance pay dispute and Burr did not
make a response; that Burr, during a different discussion and in

response to queries that no one can recall with any specificity, stated that the maximum exposure on the claim was $139,000; and that, at some point, Burr said there was nothing new to add beyond the disclosures already made.  The uncontroverted testimony from multiple deponents, including both those who knew of the expanded claims and inflated demand at the time and those who did not, is that there was no response given that appeared at the time to be misleading or incomplete in light of the question posed.

Media General has failed to come forward with specific facts showing there is a genuine issue for trial regarding how the circumstances under which the defendants responded to the questions in the pre-closing discussions made the responses misleading.  It is undisputed that Park through counsel fully disclosed Prusator's expanded claims more than one month earlier in the audit response letter, that Media General had full access to the audit documents, and that Media General's lead lawyers were all experienced in corporate mergers and familiar with the materiality of audit response letters.  There is no evidence that Media General's representatives asked Park's representatives during the discussions to elaborate on Prusator's expanded claims, or that asking Park representatives to "tell us about the Prusator matter" proves circumstances that make a response discussing the severance agreements and liability assessments

-20-

misleading.  The questions posed and the answers given were not
recorded.  Indeed, the witnesses present at the time are now
unable to recall the questions and answers with sufficient
precision to establish that any omission or misrepresentation was
made.  Even if stale memories are fully credited, the deponents'
credibility is not questioned, and the evidence and reasonable
inferences drawn from it are taken in the light most favorable to
Media General, Media General cannot establish what the
circumstances were, and therefore cannot establish an omission in
light of the circumstances.  Accordingly, Media General will be
unable to establish a required element of its securities fraud
claim and defendants are entitled to summary judgment on that
basis.

III. REASONABLE RELIANCE

A plaintiff is barred from recovering on either a claim of
securities fraud or common law fraud if its reliance on the
alleged misrepresentations or omissions was not reasonable or
justifiable.  One-O-One Enterprs. v. Caruso, 848 F.2d 1283, 1286
(D.C. Cir. 1988) (stating that both federal securities law and
D.C.'s common law of fraud requires reasonable reliance (citing
Isen v. Calvert Corp., 379 F.2d 126, 130 (D.C. Cir. 1967)
(applying D.C. law))); Hercules & Co., 613 A.2d at 923 (stating
that D.C. common law fraud requires proof that a plaintiff's
reliance was reasonable).  "A showing of reliance may be defeated

. . . where defendant establishes that plaintiff should have discovered the facts." <u>Royal Am. Mgrs. Inc. v. IRC Holding Corp.</u>, 885 F.2d 1011, 1015 (2d Cir. 1989).

"[T]he justifiability of [a plaintiff's] reliance [is] frequently translated into a requirement of due diligence by the plaintiff." <u>Dupuy v. Dupuy</u>, 551 F.2d 1005, 1014 (5th Cir. 1977). The degree of diligence[3] required to be reasonable or justifiable is properly judged in the context of related factors.  "The obligation of due care must be a flexible one, dependent on the circumstances of each case." <u>Straub</u>, 540 F.2d at 598.  "To determine whether an investor acted recklessly, and therefore without justifiable reliance, no single factor is dispositive, and all relevant factors must be considered and balanced." <u>Brown v. E.F. Hutton</u>, 991 F.2d 1020, 1032 (2d Cir. 1993) (citing <u>Royal Am. Mgrs.</u>, 885 F.2d at 1016).  In assessing the diligence required, some courts consider a non-exhaustive list of eight factors:  (1) the sophistication and expertise of the plaintiff in financial and securities matters; (2) the existence of long-standing business or personal relationships; (3) the existence of a fiduciary duty; (4) access to relevant information; (5) concealment of the fraud; (6) the opportunity to detect the

---

[3]  Media General has argued that its conduct should be examined under the standard of "minimal diligence."  The District of Columbia Circuit has not adopted this more lenient standard of the required diligence.  In any case, the result here is the same under either standard.

-22-

fraud; (7) whether the plaintiff initiated or tried to expedite the transaction; and (8) the generality or specificity of the alleged misrepresentations.  Banca Cremi, S.A. v. Alex. Brown & Sons, Inc., 132 F.3d 1017, 1028 (4th Cir. 1997) (identifying eight possibly-relevant factors to consider) (citing Myers v. Finkle, 950 F.2d 165, 167 (4th Cir. 1991));  Brown v. E.F. Hutton, 991 F.2d at 1028 (same);  Molecular Technolgy Corp. v. Valentine, 925 F.2d 910, 918 (6th Cir. 1991) (same);  Zobrist v. Coal-X, Inc., 708 F.2d 1511, 1516 (10th Cir. 1983) (same);  see also Straub, 540 F.2d at 598 (identifying as "worthy of consideration" five of the same factors).  And, "sophisticated businessmen . . . must, if they wish to recover under federal law, investigate the information available to them with the care and prudence expected from people blessed with full access to information."  Hirsch v. Dupont, 553 F.2d 750, 763 (2d Cir. 1977).  "[A] party alleging that it was defrauded, at least in the context of commercial dealings at arm's length, must establish not only that it actually relied on a false representation, but also that its reliance was objectively reasonable."  Hercules, 613 A.2d at 933 (footnote and citations omitted).

The undisputed record facts in this case demonstrate that Media General was a sophisticated and experienced investor, aided by experienced attorneys, and that the transaction was negotiated

at arm's length, not on the basis of a long-standing business or
personal relationship or any fiduciary duty.  While Tomlin and
Knapp initially proposed the sale, there is no allegation that
Media General was a mark being set up at that point, and there is
no allegation that the sellers rushed the purchase.

It is also undisputed that defendants disclosed in detail
the facts of the expanded Prusator claims in its audit response
letter.  All involved knew that Media General was aware that
Prusator had threatened a lawsuit.  Similarly, all involved knew
that Media General had examined the existing audit response
letters in the past, and had the opportunity to examine the most
recent audit response letters.  There is no showing that
defendants knew that Media General had not seized its opportunity
to review the papers to which it had requested access.  To the
contrary, the uncontroverted record evidence is that neither Burr
nor Thomas knew until some time after the closing that Media
General had not read the audit response letter and claimed not to
be otherwise aware of Prusator's expanded claims.

A comparison of the record facts here with those in other
reported cases demonstrates that with respect to the threatened
Prusator litigation, Media General "did not act with even the
minimal diligence necessary to avoid the imputation of
recklessness."  <u>Royal Am. Mgrs.</u>, 885 F.2d at 1016.  In <u>Royal
American Managers</u>, the court affirmed the district court's

-24-

dismissal of the Rule 10b-5 and common law fraud claims at the close of evidence for lack of proof, _id._ at 1013, because the sophisticated and experienced plaintiff, aided by experienced counsel, had not acted with even minimal diligence in relying on an interpretation of a statute by defendants' attorney where there had been no concealment of the statute interpreted and plaintiff had "access to all relevant information and hence the opportunity to detect the [alleged] 'fraud.'"  _Id._  Similarly, in _Hirsch v. Dupont_, 553 F.2d at 762-63, the court affirmed the district court's grant of summary judgment because the plaintiff's conduct fell far short of the diligence required where sophisticated businessmen "blessed with full access to information" regarding the risks of the transaction disregarded certain information in their possession and did not make any further inquiries based on that information.  In _Banca Cremi_, 132 F.2d at 1030-32, the court affirmed the district court's grant of summary judgment because the plaintiff, a sophisticated investor, had not shown that its reliance on the defendants' alleged omissions and misrepresentations was justifiable when plaintiff had ready access to its own experts' advice and risk assessments. "As in any action for fraud, reliance on false statements must be accompanied by a right to rely. . . .  Here, the Bank lost its right to rely by its own recklessness.  The Bank continued to purchase [the investments] after it had sufficient information,

-25-

given its sophistication, to be well apprised of the risks it
would face . . . .  Given that the Bank was aware of the risks
involved in investing . . ., the Bank was not justified in
relying on [the defendants'] alleged omissions and
misstatements."  Id. at 1032 (internal quotation marks, prior
alterations and citation omitted).

Even in the face of outright lies -- something the record in
this case does not establish -- courts have found a plaintiff's
reliance on a misrepresentation reckless when plaintiff possessed
a document containing an accurate representation.  Zobrist, 708
F.2d at 1518-19 (applying the recklessness standard and holding
that when the truth is in the hands of the plaintiff,
constructive knowledge of the truth must be imputed to the
plaintiff).  In the same vein, a plaintiff's reliance is reckless
when he closes his eyes to a known risk and does not investigate
further, even in the face of affirmative lies by the defendant,
of which none has been shown here.  Teamsters Local 282 Pension
Trust Fund v. Angelos, 762 F.2d 522, 529-30 (7th Cir. 1985)
(discussing circumstances under which a plaintiff's reliance on a
defendant's outright lies are not actionable).  In addition,
where the misrepresentation or omission concerns things known
equally well by the listener and the speaker, a plaintiff's
reliance might not be reasonable.  Id.  Unobstructed and ready
access to the facts may make reliance reckless even where, unlike

-26-

Media General, the plaintiff is not sophisticated.  In <u>Brown v.</u>
<u>E.F. Hutton</u>, 991 F.2d at 1032, even though the plaintiff-
investors were unsophisticated and the defendant-brokers who
solicited their business were very experienced, the investors'
reliance on the brokers' general assurances of profit was
reckless, i.e., did not meet the minimal diligence standard, in
the face of prospectus' disclosure of the investment's risk
factors provided, which contradicted the brokers' assurances.

     In contrast, where a plaintiff does not have unobstructed
access to information disclosing the alleged omitted material
fact or correcting the alleged misrepresentation, courts are
reluctant to find that a plaintiff's reliance was reckless.  <u>See</u>
<u>Molecular Tech.</u>, 925 F.2d at 918 (applying the recklessness or
minimal diligence standard and holding that it could not as a
matter of law find that plaintiff's reliance was reckless where
plaintiff had no access to information that would have revealed
the fraud).  Even where the plaintiff is sophisticated and
experienced in the type of transactions at hand, if he has no
access to information that would correct his misunderstanding in
reliance, his reliance may be reasonable.  <u>See, e.g.</u>, <u>Nye v.</u>
<u>Blyth Eastman Dillon & Co, Inc.</u>, 588 F.2d 1189 (8th Cir. 1978)
(concluding that the trial court's finding that plaintiff's
reliance was reasonable where plaintiff checked with broker's
superior and the superior confirmed broker's lies was not clearly

erroneous); <u>Rubin v. Schottenstein, Zox & Dunn</u>, 143 F.3d 263, 266, 268-69 (6th Cir. 1998) (declining to find that reliance was reckless as a matter of law where it was likely that seller's bank would not have, without seller's permission, revealed that seller was in fact in default and that the solicited investment would constitute a further material breach of the seller's financing agreement with the bank, and where plaintiffs' request for permission to contact bank was met with seller's "strenuous efforts to dissuade" plaintiffs from making contact by asserting that contact would be detrimental to seller for unrelated reasons, and where in response to investors' "probing questions," seller falsely stated that it "was not experiencing any problems" with its bank and that "everything . . . was fine.").[4]

In sum, a review of reported cases, many of which are cited by the parties, demonstrates that Media General's conduct under the circumstances was not reasonable even under the minimal

---

[4] In some cases, other factors such as trust based on a long-term relationship may lead to reasonable reliance even where plaintiff had access to corporate books and records but did not check them. <u>See</u> <u>Holdsworth v. Strong</u>, 545 F.2d 687, 697 (10th Cir. 1976) (affirming that plaintiff's reliance, despite his access to the corporate books and records that would have revealed the truth, was reasonable where plaintiff's long-time friend and business partner misrepresented facts); <u>Straub</u>, 540 F.2d at 591 (affirming district court's finding that reliance was reasonable where trust based on a long-standing business relationship was abused). However, there are no such factors in this case that might mitigate Media General's duty of even minimal diligence in the face of unobstructed access to the facts.

-28-

diligence standard.  As a sophisticated investor, Media General knew how and where to obtain the facts, had ensured its access to the facts, and then failed to follow through by reading the audit response letter to which it had unobstructed access, even though it knew of the existence of the Prusator litigation threat.  Its reliance on oral responses -- imprecisely recollected and described oral responses to imprecisely recollected and described oral inquiries -- was not reasonable where all involved knew that it had access to a detailed written audit response letter. Accordingly, Media General is barred from recovery on its claims for securities fraud and common law fraud.  Because it cannot recover on its fraud claims, it also cannot recover on its civil conspiracy claim, and summary judgment will be entered for defendants on all counts.

<u>CONCLUSION</u>

Media General cannot show loss causation with respect to the $10 million in damages that it seeks, and because that amount is not subject to proof, the $10 million will be disallowed as damages for both fraud claims.  Media General has not shown that in light of all the circumstances, a reasonable jury could conclude that the statements made by defendants constituted misrepresentations or omissions.  In addition, Media General, a sophisticated and experienced business investor, has not shown that its reliance on certain isolated statements could be found

-29-

reasonable or justifiable by any reasonable jury.  Accordingly,

summary judgment will be granted to defendants on the securities

fraud, common law fraud, and civil conspiracy claims.  A final

order accompanies this memorandum opinion.

SIGNED this 13th day of August, 2007.


_____/s/_____
RICHARD W. ROBERTS
United States District Judge